

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-1998

# Wheeling Lake Erie v. Pub Util Comm PA

Precedential or Non-Precedential:

Docket 96-3703,96-3704

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Wheeling Lake Erie v. Pub Util Comm PA" (1998). *1998 Decisions.* Paper 62.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/62

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 31, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-3703, 96-3704

WHEELING & LAKE ERIE RAILWAY COMPANY

v.

PUBLIC UTILITY COMMISSION OF THE
COMMONWEALTH OF PENNSYLVANIA; DAVID W.
ROLKA, Chairman of the Pennsylvania Public Utility
Commission; JOSEPH RHODES, JR.; JOHN M. QUAIN;
LISA CRUTCHFIELD; JOHN HANGER, In their Official
Capacities as Members of the Pennsylvania Public Utility
Commission; SCOTT TOWNSHIP, PENNSYLVANIA;
JAMES P. MULLIGAN, Chairman of the Board of
Commissioners of Scott Township, Pennsylvania

       SCOTT TOWNSHIP,
       PENNSYLVANIA and JAMES P.
       MULLIGAN, Chairman of the
       Board of Commissioners of Scott
       Township, Pennsylvania,
       Appellants in 96-3703

       PUBLIC UTILITY COMMISSION
       OF THE COMMONWEALTH OF
       PENNSYLVANIA; DAVID W.
       ROLKA, JOSEPH RHODES, JR.;
       JOHN M. QUAIN, LISA
       CRUTCHFIELD and
       JOHN HANGER,
       Appellants in 96-3704

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civ. No. 94-01776

Argued Thursday, September 11, 1997

Before: MANSMANN, NYGAARD and GARTH, Circuit Judges

(Opinion Filed: March 31, 1998)

        David A. Salapa (Argued)
        Assistant Counsel
        John F. Povilaitis
        Chief Counsel
        Pennsylvania Public Utility
        Commission
        P.O. Box 3265
        Harrisburg, PA 17105-3265

        Counsel for Appellants, Pennsylvania
        Public Utility Commission; David W.
        Rolka; Joseph Rhodes, Jr.; John M.
        Quain; Lisa Crutchfield; and John
        Hanger

        David L. Haber, Esquire (Argued)
        Weinheimer, Schadel & Haber
        602 Law & Finance Building
        429 Fourth Avenue
        Pittsburgh, PA 15219

        Counsel for Appellants, Scott
        Township, Pennsylvania; and James
        Mulligan

        Gregory G. Fletcher (Argued)
        Baker, Donelson, Bearman &
         Caldwell
        165 Madison Avenue, Suite 2000
        Memphis, TN 38103

        Richard R. Wilson
        Vuono, Lavelle & Gray
        2310 Grant Building
        Pittsburgh, PA 15219

        Counsel for Appellee

Charles D. Gray
National Association of Regulatory
Utility Commissioners
1102 ICC Building
P.O. Box 684
Washington, D.C. 20044

Counsel for Amicus, National
Association of Regulatory Utility
Commissioners

Andrew S. Gordon
Chief Counsel
Gina M. D'Alfonso
Assistant Counsel in Charge
Commonwealth of Pennsylvania
Department of Transportation
Forum Place, 555 Walnut Street
Office of Chief Counsel, 9th Floor
Harrisburg, PA 17101-1900

Counsel for Amicus, Commonwealth
of Pennsylvania Department of
Transportation

OPINION OF THE COURT

NYGAARD, Circuit Judge.

In this appeal we must decide whether assessing a railroad for a portion of the construction and maintenance costs of a bridge intersecting its right-of-way constitutes a discriminatory tax under the Railroad Revitalization and Regulatory Reform (4-R) Act of 1976, 49 U.S.C. S 11501.1 The district court held that the assessment was a discriminatory tax. We will reverse.

_____

1. The original complaint alleges a violation of 49 U.S.C. S 11503. That section was recodified pursuant to Pub. L. No. 104-88, S 102(a) (1996). We will refer to provisions of the 4-R Act at issue here by section number as currently codified in title 49, U.S. Code.

3

I. Background

The Wheeling & Lake Erie Railway Company subleases a
railroad right-of-way passing under "Old Washington Pike"
in Scott Township, Allegheny County, Pennsylvania. The
bridge supporting that highway became so deteriorated that
it was closed in 1982. The Township procured the
necessary approvals from the Pennsylvania Public Utility
Commission and constructed a new bridge at the
Township's initial expense. The Commission then ordered
Wheeling to pay 3% of the total construction costs of the
bridge replacement project and 15% of the maintenance
costs of the new bridge (excluding costs of snow and ice
removal).2 The Commission also assessed another railroad,
whose tracks pass under the same span, 3% and 15%
respectively. That railroad is not a party. The Pennsylvania
Department of Transportation was to pay 7% of the
construction costs. The Township was to pay the remaining
87% of the construction costs and 70% of the maintenance
costs, with an 80% reimbursement for construction costs
coming from Pennsylvania's Billion Dollar Bridge Project
Fund.

Wheeling filed this action requesting declaratory and
injunctive relief from the construction and maintenance
costs. It argued that the assessment was a discriminatory
tax in violation of the 4-R Act. All parties filed motions for
summary judgment. In its order granting Wheeling's
motion, the district court declared that the assessment was
an unlawfully discriminatory tax under the 4-R Act. The
court also enjoined the defendants from assessing or
collecting the construction and maintenance costs from
Wheeling. The Commission and the Township appealed
separately. We consolidated the appeals.

_____

2. The Commission delegated this case to a Public Utility Commission
Administrative Law Judge who issued a Recommended Decision. (J.A. at
226.) That decision included a proposed allocation of the construction
and maintenance costs and also decided that Wheeling was not
discriminated against on the basis of its railroad status. (J.A. at 245-
50.)
The Commission adopted the Recommended Decision in its September
23, 1994 Order. (J.A. at 266.)

4

II. Eleventh Amendment Immunity

The Commission did not raise its Eleventh Amendment 3 argument before the district court. Nonetheless, Eleventh Amendment immunity can properly be raised for thefirst time on appeal. See Edelman v. Jordan, 415 U.S. 651, 658, 94 S. Ct. 1347, 1363 (1974) ("the Eleventh Amendment sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); Bolden v. Southeastern Pa. Trans. Auth., 953 F.2d 807, 812 (3d Cir. 1991).

The Eleventh Amendment bars suits against unconsenting states in federal courts. See Seminole Tribe of Fla. v. Florida, ___ U.S. ___, 116 S. Ct. 1114, 1122 (1996). There are two exceptions: Congress may abrogate a state's immunity, id., and parties may sue state officers for prospective injunctive and declaratory relief. See Idaho v. Coeur d'Alene Tribe of Idaho, ___ U.S. ___, 117 S. Ct. 2028, 2034 (1997); Seminole, ___ U.S. at ___, 116 S. Ct. at 1132; Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908); Balgowan v. New Jersey, 115 F.3d 214, 217 (3d Cir. 1997). Here, the parties do not dispute that the Pennsylvania Public Utility Commission is an arm of the Commonwealth of Pennsylvania protected by Eleventh Amendment principles of sovereign immunity.4 Also, Pennsylvania has

_____

3. "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the Unites States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[T]he Eleventh Amendment [stands] for the constitutional principle that state sovereign immunity limited the federal courts' jurisdiction under Article III." Seminole Tribe of Fla. v. Florida, ___ U.S. ___, 116 S. Ct. 1114, 1127 (1996). "[A] State can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commence or prosecuted against it. The Amendment, in other words, enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction." Idaho v. Coeur d'Alene Tribe of Idaho, ___ U.S. ___, 117 S. Ct. 2028, 2033 (1997).

4. In its reply brief, the Commission analyzed whether it is an arm of the state under the criteria this Court set forth in Christy v. Pennsylvania Turnpike Commission, 54 F.3d 1140, 1144 (3d Cir. 1995). The Commission concluded that they are indeed an arm of the state, and Wheeling does not take issue with that determination.

5

not given its consent to be sued in federal court. 5 The question remaining is whether any exceptions to immunity apply.

A. Congressional Abrogation of Immunity

A valid abrogation of Eleventh Amendment immunity requires Congress to "unequivocally express[ ] its intent to abrogate the immunity" and to act "pursuant to a valid exercise of power." Seminole, ___ U.S. at ___, 116 S. Ct. at 1123 (quoting Green v. Mansour, 474 U.S. 64, 68, 106 S. Ct. 423, 426 (1985)). Here, the parties agree that section 11501(c)6 is an unmistakably clear expression of Congress's intent to abrogate states' immunity regarding violations of section 11501(b). However, the parties disagree on whether the statute is a valid exercise of congressional power.

The dispute centers largely around Seminole, which overruled Pennsylvania v. Union Gas Co., 491 U.S. 1, 23, 109 S. Ct. 2273, 2286 (1989) (holding that Congress could validly abrogate a state's sovereign immunity pursuant to its Commerce Clause powers). In Seminole, the Court noted that it had previously recognized only one other source of congressional power to abrogate states' sovereign immunity --the Fourteenth Amendment. Seminole, ___ U.S. at ___, 116 S. Ct. at 1125 (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S. Ct. 2666 (1976)). Thus, after Seminole, the only remaining source of congressional power to abrogate states' Eleventh Amendment immunity is the Fourteenth Amendment.

_____

5. The Commonwealth of Pennsylvania has codified its position on immunity as follows: "Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States." 42 Pa. Cons. Stat. S 8521.

6. Subsection (c) states in pertinent part as follows:

      "Notwithstanding section 1341 of title 28 and without regard to the
      amount in controversy or citizenship of the parties, a district
court
      of the United States has jurisdiction, concurrent with other
      jurisdiction of courts of the United States and the States, to
prevent
      a violation of subsection (b) of this section."

49 U.S.C. S 11501(c).

6

Congress promulgated the 4-R Act pursuant to its Commerce Clause powers because of the interstate nature of the railroad industry. Section 11501 announces Congress's concern that discriminatory taxation "unreasonably burden[s] and discriminate[s] against interstate commerce." 49 U.S.C. S 11501(b); see also 49 U.S.C. S 10101 (listing the purposes and policies of railroad regulation). However, when determining the sources of Congress's authority to legislate, we may look beyond the expressed constitutional basis in a statute's preamble or legislative history. See Fullilove v. Klutznick, 448 U.S. 448, 478, 100 S. Ct. 2758, 2774-75 (1980). The Supreme Court directs us to:

> "proceed to the consideration whether [S 11501] is "appropriate legislation" to enforce the Equal Protection Clause, that is . . . whether [S 11501] may be regarded as an enactment to enforce the Equal Protection Clause, whether it is "plainly adapted to that end" and whether it is not prohibited by but is consistent with "the letter and spirit of the constitution." "

Katzenbach v. Morgan, 384 U.S. 641, 651, 86 S. Ct. 1717, 1724 (1966). In a later examination of Morgan, the Court established that to answer this inquiry:

> "[i]t was enough that the Court could perceive a basis upon which Congress could reasonably predicate a judgment that application of literacy qualifications within the compass of S 4(e) would discriminate in terms of access to the ballot and consequently in terms of access to the provision of administration of government programs."

Fullilove, 448 U.S. at 477, 100 S. Ct. at 2774 (citing Morgan, 384 U.S. at 652-53, 86 S. Ct. at 1722). 7

_____

7. Since Seminole, the District of Wyoming is the only other court to address this issue, specifically regarding the 4-R Act. See Union Pac. R.R. Co. v. Burton, 949 F. Supp. 1546 (D. Wyo. 1996). We disagree with that court's analysis because it was restricted to the expressed purposes of the 4-R Act set forth in section 10101. See id. at 1554. We look beyond the general purposes of the 4-R Act as a whole, to what we perceive as the purpose underlying section 11501, the portion of the act implicated here.

7

The legislative history of the statute before us shows "Congress was aware that the railroads" `are easy prey for State and local tax assessors" in that they are "nonvoting, often nonresident, targets for local taxation," who cannot easily remove themselves from the locality.' " Department of Rev. of Or. v. ACF Indus., 510 U.S. 332, 336, 114 S. Ct. 843, 847 (1994) (quoting Western Air Lines, Inc. v. Board of Equalization, 480 U.S. 123, 131, 107 S. Ct. 1038, 1043 (1987) (quoting S. Rep. No. 91–630, at 3 (1969))). Moreover, another court of appeals has held that the very purpose of section 11501 was to remedy discrimination against railroads:

> "Until this law was passed, as pointed out by the appellants, states could constitutionally classify railroads differently from all other taxpayers for the imposition of state taxes without violating the equal protection clause of the Fourteenth Amendment. It was the obvious purpose of Congress to put an end to this practice, where such treatment of the railroads as a class was discriminatory in effect."

Alabama Great S. R.R. Co. v. Eagerton, 663 F.2d 1036, 1040 (11th Cir. 1981) (emphasis added). The Supreme Court has also said that "[c]orrectly viewed, S 5 [of the Fourteenth Amendment] is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." Morgan, 384 U.S. at 651, 86 S. Ct. at 1723–24.

It is evident to us that Congress recognized the potential for state and local taxing authorities to discriminate against railroads in violation of their Equal Protection rights under the Fourteenth Amendment. We conclude that Congress had the power, pursuant to Section Five of the Fourteenth Amendment, to promulgate section 11501, and did so to protect the railroads. Therefore, Congress validly abrogated Eleventh Amendment immunity, and the district court properly exercised jurisdiction over this lawsuit.

Neither our analysis nor our conclusion is affected by the recent decisions cited by the Commission. It cites Wilson–Jones v. Caviness, 99 F.3d 203 (6th Cir. 1996), as

employing the correct post-Seminole analysis for determining whether an act of Congress, generally regarded to be within its Commerce Clause powers, can also be justified by the Fourteenth Amendment. The Commission reads Wilson-Jones to hold that, barring an explicit congressional recitation of authority under the Fourteenth Amendment, only statutes that remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection can be regarded as enactments to enforce the provisions of the Fourteenth Amendment.

We disagree with this narrow reading of Wilson-Jones. There, the Court found no evidence that the core provisions of the Fair Labor Standards Act, before being amended by the Equal Pay Act, were enacted pursuant to Section Five of the Fourteenth Amendment. Although the Court feared the implications of an expansive rule "that an act is valid [merely] if it is rationally related to achieving equal protection of the laws," it expressly admitted that its "opinion might be different if Congress madefindings that a particular group needed legal protection to remedy some sort of invidious discrimination not directly addressed by federal precedent." Wilson-Jones, 99 F.3d at 209, 210 n.4. Here, however, the remedial nature of section 11501's constitutional protection is evident, despite the lack of an explicit congressional statement. We believe that Congress was within its discretion when it found that railroads need special protection from local tax assessors. Therefore, we reach a different conclusion than the Court in Wilson-Jones.8

Nor is our result affected by City of Boerne v. Flores, ___ U.S. ___, 117 S. Ct. 2157 (1997), in which the Supreme Court declared the Religious Freedom Restoration Act unconstitutional. The Court found that the Act was "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." Id. at ___, 117 S. Ct. at 2170. In so holding,

_____

8. The reasoning in Wilson-Jones was also rejected in another Fair Labor Standards Act case. See Mills v. Maine, 118 F.3d 37, 45 (1st Cir. 1997).

9

the Court reasoned that "[i]f Congress could define its own powers by altering the Fourteenth Amendment's meaning," it would be "difficult to conceive of a principle that would limit congressional power." Id. at ___, 117 S. Ct. at 2168. Here, section 11501 is not out of proportion to its objective, nor does it substantively change any constitutional protections.

We recently decided College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, Nos. 97–5055, 97–5086, 1997 WL 749514 (3d Cir. Dec. 5, 1997), in which we held that the right to be free of false advertising is not a constitutionally protected intangible property right. Therefore, the Due Process Clause of the Fourteenth Amendment was not implicated, and we concluded that the Trademark Remedy Clarification Act of 1992 did not abrogate Florida's immunity because it did not further the purposes of the Fourteenth Amendment. College Savings Bank, however, was expressly limited to its facts, id. at *9, and did not concern the Equal Protection Clause. It does not contradict our decision. Similarly, there is no dissonance between our decision in In re Sacred Heart Hospital of Norristown, No. 97–1126, 1998 WL 3627 (3d Cir. Jan. 8, 1998), and our decision here. In Sacred Heart, we did not distinguish between the Bankruptcy Clause and the Commerce Clause (both Article I powers) as being inappropriate sources of congressional power to abrogate states' Eleventh Amendment immunity. Id. at *5. Further, we found "no evidence suggesting that S 106(a) [of the Bankruptcy Code] was enacted pursuant to any constitutional provision other than Congress' Bankruptcy Clause power." Id. at *6. Here, however, we have found such evidence in section 11501's legislative history and judicially-recognized anti-discrimination purpose.

In sum, section 11501 is a valid exercise of congressional power under Section Five of the Fourteenth Amendment, thus effectively abrogating the Commission's Eleventh Amendment immunity.9 We now turn to the merits of the appeal.

_____

9. The individual Commissioners also claim that they are immune from suit in federal court pursuant to the Eleventh Amendment. Wheeling

III. The 4-R Act

Wheeling argues that the assessment of construction and maintenance costs violates section 11501 because it is an illegal tax that discriminates against railroads. 10 The district court agreed, concluding that the assessments were"taxes" within the meaning of section 11501. Because this issue involves the interpretation of federal statutory law, our review is plenary. See In re TMI, 89 F.3d 1106, 1112 (3d Cir. 1996). Unfortunately, the 4-R Act does not define "tax." We must, therefore, begin by determining the appropriate rule of construction.

In Department of Revenue of Oregon v. ACF Industries, 510 U.S. 332, 114 S. Ct. 843 (1994), the Court held that nonrailroad property tax exemptions were not prohibited by subsection (b)(4).

> "When determining the breadth of a federal statute that impinges upon or pre-empts the States' traditional powers, we are hesitant to extend the statute beyond its evident scope. We will interpret a statute to pre-empt the traditional state powers only if that result is "the clear and manifest purpose of Congress." "

Id. at 345, 114 S. Ct. at 850-51 (citations omitted).

We have decided two cases dealing with the statutory interpretation of "taxes" in a similar context. In National

_____

contends that the Commissioners are within the second exception noted above: state officials can be sued for prospective injunctive and declaratory relief from constitutional violations. See Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908); Balgowan v. New Jersey, 115 F.3d 214, 217 (3d Cir. 1997); Laskaris v. Thornburgh, 661 F.2d 23, 26 (3d Cir. 1981); see also Idaho v. Coeur d'Alene Tribe of Idaho, ___ U.S. ___, 117 S. Ct. 2028, 2034 (1997); Seminole, ___ U.S. ___, 116 S. Ct. 1114, 1132 (1996). The parties dispute whether the declaratory or injunctive relief that Wheeling seeks is truly prospective. Because we have decided that the Commission is not immune, we need not reach this issue.

10. "The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a state may not do any of them: . . . Impose another tax that discriminates against a rail carrier . . . ." 49 U.S.C. S 11501(b)(4).

11

Railroad Passenger Corp. v. Pennsylvania Public Utility Commission, 848 F.2d 436 (3d Cir. 1988) (hereinafter Amtrak), the issue was whether "any taxes or other fees" covered levies against Amtrak for building and maintaining the Cassatt Avenue bridge. Id. at 438 (interpreting 45 U.S.C. S 546b (recodified at 49 U.S.C. S 24301(l))). That decision outlined the declining history of intercity rail passenger service in America and Congress's efforts to revitalize it. Id. at 438. Congress rationalized Amtrak's exemption by theorizing that cities would gladly pay a user contribution to maintain rail passenger service. Id. In Amtrak, we reasoned, "[w]hether such `special assessments' will be construed as `taxes' depends on the context in which the terms are raised." Id. Additionally, we instructed that "the meaning of the word `tax' is a matter of federal law deduced from congressional policy underlying the statute, rather than from state tax labels developed in an entirely unrelated legal context." Id. at 439. After noting that exemptions from taxation usually do not apply to such assessments, we adopted some general rules:

> "When a tax exemption is granted to certain private entities, the statutory language is construed closely because it affords a special privilege not available to others. Likewise, when a statute waives the federal government's freedom from local taxation, that language is also narrowly construed because it defeats the immunity shielding the federal government. In interpreting an exemption statute, the intention of the legislative body is pivotal."

Id. Amtrak, we concluded, was not an ordinary private firm; Congress intended it to be exempt from state and local taxes and fees to the same extent as the federal government. Thus, under a liberal reading of that statute, the bridge assessment was within the meaning of the statutory phrase "taxes or other fees." Id. at 439-40.

Likewise, in Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission , 826 F. Supp. 1506 (E.D. Pa. 1993) (hereinafter SEPTA ), aff'd 27 F.3d 558 (3d Cir. 1994) (unpublished table decision), the same issue arose under a different statute, which confers Amtrak's tax immunity upon certain commuter authorities.

12

See 49 U.S.C. S 24501(g). The district court found that Congress intended the phrase "taxes or other fees" in section 24501(g) to have the same broad meaning as our Amtrak decision found Congress to have given to identical language in section 24301(l). Id. at 1525-26.

Amtrak and SEPTA involved the interpretation of statutes with different purposes and histories from the statute at issue here. Nonetheless, we believe the reasoning underlying those cases is instructive regarding the principles of statutory construction applicable here. The statutes in Amtrak and SEPTA were construed broadly because those entities had tax immunity comparable to that of the federal government. In contrast, we must interpret section 11501 strictly here, because Wheeling is a private entity benefitting from a special provision exempting it from discriminatory taxation. Thus, we must consider the context in which the term "tax" is raised and the congressional policy underlying section 11501 to determine if it was the clear and manifest purpose of Congress to include such assessments within that provision.

As the Commission, Scott Township, and the Department of Transportation all point out, there is nothing in the legislative history that sheds light on what Congress meant by the word "tax" in section 11501(b)(4). See generally Alabama Great S. R.R. Co. v. Eagerton, 663 F.2d 1036, 1041 (11th Cir. 1981). Moreover, they maintain that because assessing railroads for such improvements was commonplace when the 4-R Act was enacted and Congress did not address that practice in either the Act or the legislative history, then Congress did not intend "tax" to include bridge assessments. This argument parallels the Supreme Court's reasoning in ACF regarding ad valorem tax exemptions:

> "It was common at the time [S 11501] was drafted, as it is now, for States with generally applicable ad valorem property taxes to exempt various classes of commercial property. . . . Given the prevalence of property tax exemptions when Congress enacted the 4-R Act, [S 11501's] silence on the subject--in light of the explicit prohibition of tax rate and [tax] assessment

13

> ratio discrimination--reflects a determination to permit
> the States to leave their exemptions in place."

ACF, 510 U.S. at 344, 114 S. Ct. at 850.

Another court followed this reasoning in Chicago & North
Western Transportation Co. v. Webster County, 71 F.3d 265
(8th Cir. 1995). There, the County Board of Supervisors
was expanding a drainage ditch running under a railroad's
right-of-way. The County ordered the railroad to install a
larger culvert under its tracks. When the railroad refused,
the County installed the culvert anyway, and assessed the
cost against the railroad. The Court found that the culvert
solely benefitted the railroad because it kept the railroad's
right-of-way intact: the Supervisors could have legally
bulldozed a wider ditch through the right-of-way, resulting
in the same benefit to the public. The Court also noted that
before the passage of the 4-R Act:

> "many states had statutes requiring railroads to
> construct improvements, including culverts, when
> drainage ditches crossed their rights-of-way . . . .
>
> These statutes represent the juridical background
> against which Congress passed the 4-R Act, and
> nothing in either its language or its legislative history
> indicates that Congress wanted to upset or undermine
> state drainage laws. Congress did not express an intent
> to preempt the states' longstanding and common
> practice of charging railroads for certain drainage
> improvements, and we refuse to impute that intent into
> S [11501(b)(4)], given the historical environment in
> which it was enacted."

71 F.3d at 267-68. Here, the statutes giving the
Commission the powers to order the construction and
assess the costs of railroad crossing improvements date
back to 1913. See 66 Pa. Cons. Stat. Ann. SS 2702, 2704
(historical notes). Like the ad valorem tax exemptions in
ACF and the culvert assessment in Chicago & North
Western, assessing bridge improvement costs in
Pennsylvania was a longstanding practice when Congress
enacted the 4-R Act. Thus, we are convinced that the
congressional policy underlying section 11501 was not to
treat bridge assessments as taxes. We conclude that it was

14

not the clear and manifest purpose of Congress to include bridge assessments within the meaning of the word "tax" in section 11501(b)(4).

This conclusion is consistent with our comments in Amtrak that such assessments are usually not considered within exemptions from taxation. 848 F.2d at 439. There, we found support in an early Supreme Court case reaching a similar conclusion:

> "The charges here [costs of grading and paving a street] are not taxes proper, are not contributions to the state or to the city for the purpose of enabling either to carry on its general administration of affairs, but are charges only, and specially, for the cost for a local improvement supposed to have resulted in an enhancement of the value of the railroad company's property."

Illinois Cent. R. Co. v. Decatur, 147 U.S. 190, 208-209, 13 S. Ct. 293, 298 (1893) (cited by Amtrak, 848 F.2d at 439). Importantly, the amount assessed here does not raise revenue for the general fund of either the Township or the Commonwealth. (J.A. at 266-68)

Our conclusion is also consistent with the progeny of the Head Money Cases (Edye v. Robertson), 112 U.S. 580, 5 S. Ct. 247 (1884) (finding that a fifty-cent levy on ship owners for every immigrant passenger entering a U.S. port was not a tax because the money was used to regulate immigration, not for the general support of the government). Following that precedent, the Courts of Appeals for the Eighth and Ninth Circuits have decided that assessing the costs of a new drainage culvert and the costs of railroad regulation, respectively, are not taxes within the meaning of section 11501. See Chicago & North Western, 71 F.3d at 265; Union Pac. R.R. Co. v. Public Util. Comm'n of Or., 899 F.2d 854 (9th Cir. 1990). Those Courts reasoned that since the government levies at issue did not raise money for the general welfare, they were not taxes within the meaning of the respective statutes.

Wheeling's counter argument is that the assessment must be a tax because it partially relieves the state or township fisc of the cost of a bridge benefitting the public. This argument is not convincing. The bridge assessment

15

does not contribute to the general fund of either the Township or the Commonwealth and is specific to a particular bridge at a particular crossing. Moreover, none of the levies in Chicago & North Western, Union Pacific, Head Money Cases, and Decatur were held to be taxes, even though they all arguably relieved burdens on the public fisc.

According to Wheeling, Chicago & North Western held that assessments are not taxes because the improvement benefitted that railroad alone. We disagree, and believe that the more logical reading is that to the extent a portion of the project benefitted that railroad, the cost of that portion should be assessed to that railroad. Here, the Commission determined that a new bridge would benefit both the railroad and the public and assessed the costs of construction and maintenance accordingly. The Commission's assessment order adopting the Recommended Decision of the Administrative Law Judge stated: "Only after the Commission determines a particular party has a direct interest in or bears some responsibility for or obtains a discernible benefit from a specific crossing, does the Commission exercise its authority under state law to assess construction and maintenance responsibilities." (J.A. at 249, emphasis added.) Here, Wheeling directly benefits from the above-grade crossing of the Township's right-of-way because its trains are not impeded by any cross-traffic. This directly benefits Wheeling's safety and efficiency. Although the bridge benefits the general public, the peculiar benefit Wheeling receives from the construction and maintenance of the bridge reinforces our conclusion that the assessment is not a "tax" within the meaning of section 11501.

There is no need to overrule either Amtrak or SEPTA, as the Commission urges. Bridge assessments were intended to be included in the phrase "taxes or other fees" regarding the statutes applicable to those two cases, construed broadly, but not intended to be included in the word "tax" in section 11501, construed strictly. We find that the weight of authority supports our conclusion that Congress did not manifest a clear intent to include the assessment of bridge construction and maintenance costs, like those at issue

16

here, within the meaning of "taxes" in section 11501. Without taxes, there was no discriminatory taxation. Therefore, the Commission and the Township did not violate 49 U.S.C. S 11501.

IV.

In sum, we hold that the district court erred by concluding that the assessments were discriminatory taxes, and for the reasons set forth above, we will reverse.

17

GARTH, J., dissenting:

I cannot agree with the majority of the panel which has reversed the district court's order of October 11, 1996, and has held: (1) that we have subject matter jurisdiction to decide Wheeling's claim against the Commonwealth; (2) that accordingly, we need not reach the issue of the Eleventh Amendment immunity of the individual Commissioners; and (3) that the assessment of construction and maintenance costs made against Wheeling is not a tax and does not discriminate against Wheeling in violation of 49 U.S.C.A. S 11501 et seq. (West 1997) ("the 4-R Act").

Because I believe that the majority has erred in its constitutional analysis as well as in the result which it reaches, I would affirm the district court's order.[1] In doing so, I would hold that under the doctrine of Ex Parte Young, 209 U.S. 123 (1908), all future maintenance costs can be enjoined. I leave to the court for future decision, however, the question as to whether relief is available for assessed, but unpaid, construction costs.

I have come to this conclusion because I find no Congressional power under the Fourteenth Amendment to abrogate the sovereign immunity of the Commonwealth of Pennsylvania. Hence, as to the Commonwealth, we have no jurisdiction to entertain Wheeling's challenge. However, as pertains to the individual Commissioners, their action in assessing Wheeling constitutes -- under my analysis and the precedents I cite -- a discriminatory tax.

Thus, I conclude that maintenance costs accruing in the future can be enjoined. I leave open for another day the question as to whether an unpaid assessment can be enjoined without violating the Eleventh Amendment.

I.

As the majority has explained, the Eleventh Amendment

_____

1. The issue of whether Eleventh Amendment sovereign immunity strips subject matter jurisdiction from the federal forum was not before the district court.

18

to the United States Constitution confers sovereign immunity upon the States. Without its explicit consent, a State cannot be sued in federal court unless Congress has abrogated its immunity. To abrogate the States' sovereign immunity, Congress must (1) unequivocally express its intent to abrogate that immunity, and (2) act pursuant to a valid exercise of power. Seminole Tribe v. Florida, ___ U.S. ___, 116 S. Ct. 1114, 1123 (1996). At this point, I depart from the majority's analysis which upholds jurisdiction over the 4-R Act as enforcing the Equal Protection Clause because I cannot conclude that Congress could abrogate Pennsylvania's sovereign immunity by recourse to the Fourteenth Amendment.

I agree with the majority that the 4-R Act was enacted pursuant to Congress' commerce powers, and thus, after Seminole Tribe, abrogation of the States' sovereign immunity can no longer be upheld on that basis. See Majority Op. at 6. I further agree that we may venture beyond the expressed intent of Congress to determine whether the 4-R Act could have been enacted pursuant to some other valid exercise of Congressional power such that we may still retain jurisdiction over claims against the States. See id. at 8. However, I conclude that there is no such power granted under the Constitution and hence I cannot agree that Congress could have validly enacted the 4-R Act pursuant to section five, the enforcement provision of the Equal Protection Clause of the Fourteenth Amendment.

The 4-R Act explicitly prohibits conduct by State and local authorities which "unreasonably burden[s] and discriminate[s] against interstate commerce . . . ." 49 U.S.C.A. S 11501. The purpose of the 4-R Act was to "provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States." Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n, 481 U.S. 454, 457 (1987). The policy behind the 4-R Act, memorialized at 49 U.S.C.A. S 10101 (West 1997), describes the commercial and economic objectives aimed at unburdening interstate commerce by strengthening the rail transport infrastructure

19

of this country through competition and the free market. It is only with respect to the realization of these economic aims which proscribe predatory pricing, that any mention is made of prohibiting discrimination.2

Unlike the majority, I cannot conclude that Congress can validly invoke its enforcement powers under sectionfive of the Fourteenth Amendment merely because the word "discrimination" appears within the statutory text. The Congressional enforcement power under section five is not unlimited. See City of Boerne v. Flores, ___ U.S. ___, 117 S. Ct. 2157, 2163 (1997).3 Enactments legislated pursuant to Congress' section five enforcement power must be remedial in nature, designed to prevent constitutional infraction. See id.

In Wilson-Jones v. Caviness, 99 F.3d 203 (6th Cir. 1996), a pre-Flores case, the Sixth Circuit addressed whether acts legislated pursuant to Congress' commerce powers can be upheld as legitimately enforcing the Equal Protection Clause under section five of the Fourteenth Amendment after Seminole Tribe. The court concluded that legislation enforcing the Equal Protection Clause only extends to that "class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection." Id. at 210. In light of Flores, the Sixth Circuit's holding in Wilson-Jones properly recognized that

_____

2. Section 10101 states, in pertinent part:

> In regulating the railroad industry, it is the policy of the United States Government--
>
> (12) to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination.

49 U.S.C.A. S 10101(12) (emphasis added).

3. In Flores, the Supreme Court held that the Religious Freedom Restoration Act ("RFRA") was unconstitutional because its enactment exceeded Congress' enforcement power under sectionfive of the Fourteenth Amendment. Instead of remedying or preventing constitutional infringements, the Court concluded that RFRA altered the meaning the Free Exercise Clause, thereby exceeding Congress' legitimate exercise of its section five power.

20

enactments construed as enforcing the Equal Protection clause must remedy or prevent constitutional infringements.

Similarly, in CSX Transportation v. Board of Public Works, ___ F.3d ___, No. 97-1296, 1998 WL 100394 (4th Cir. Mar. 10, 1998), a post-Flores opinion, the Fourth Circuit indicated that the district court held -- as I would -- that the 4-R Act could not be enacted under the sectionfive power of the Fourteenth Amendment, as "the major purpose of the 4-R Act in general [is] to protect interstate commerce." Id. at 2.4 Accordingly, the district court dismissed a challenge by two railroads for the assessment of illegally assessed taxes under the 4-R Act for lack of subject matter jurisdiction in light of Seminole Tribe.5

By enacting the 4-R Act, Congress was not legislating to prevent unconstitutional behavior. There is no evidence that the discriminatory taxation which Congress intended to prohibit under the 4-R Act ever rose to the level of a constitutional violation such that the railroads were deprived of their right to equal protection. See, e.g., Nashville Chattanooga & St. Louis Ry. v. Browning, 310 U.S. 362 (1940) (holding that higher tax burden placed upon railroad property did not violate the Equal Protection Clause). Without such evidence, we have no basis to conclude that Congress had the power to enact the 4-R Act pursuant to its enforcement power under the Fourteenth Amendment. See Flores, 117 S. Ct. at 2169.

Thus, although the court in Wilson-Jones opined in a footnote that its conclusion might differ had "Congress made findings that a particular group needed legal protection to remedy some sort of invidious discrimination not addressed by federal precedent," 99 F.3d at 210 n.4, Congress has not made such findings in this case. Hence, the majority's rejection of Wilson-Jones despite its reliance upon this footnote is ill-founded as a justification to uphold

_____

4. I have been unable to directly access the district court opinion, as it is unavailable on either Westlaw or Lexis.

5. The Fourth Circuit reversed, however, on the basis that the district court had jurisdiction over State officials under the doctrine of Ex Parte Young. I discuss the Fourth Circuit's opinion in CSX Transportation infra at 10 n.9, 18.

21

jurisdiction over the 4-R Act. See Majority Op. at 9. Nowhere in the 4-R Act can a Congressional expression be found that the 4-R Act was passed "to secure the rights under the Fourteenth Amendment." Katzenbach v. Morgan, 384 U.S. 641, 652 (1966).

In fact, the majority implicitly concedes this point by reference to the following passage from Alabama Great Southern Railroad Company v. Eagerton, 663 F.2d 1036 (11th Cir. 1981):

> Until this law was passed . . . states could constitutionally classify railroads differently from all other taxpayers for the impositions of state taxes without violating the equal protection clause[sic] of the Fourteenth Amendment. It was the obvious purpose of Congress to put an end to this practice, where such treatment of the railroads as a class was discriminatory in effect.

Id. at 1040 (emphasis added); see Majority Op. at 8. Thus, the majority acknowledges that prior to the passage of the 4-R Act disparate classifications concerning railroads for taxation purposes were constitutional and did not violate the Equal Protection Clause. Indeed, this was well-settled law. See Browning, 310 U.S. at 369 ("so far as the Federal Constitution is concerned, a state can put railroad property into one pigeonhole and other property into another . . ."). Nevertheless, the majority now apparently characterizes such classifications as unconstitutional, sufficient to warrant congressional enactment of the 4-R Act under the Fourteenth Amendment Equal Protection Clause. From Flores, we learn that "Congress does not enforce a constitutional right by changing what the right is." 117 S. Ct. at 2164. Congress cannot make constitutional classifications unconstitutional, even though it can make such classifications unlawful. That is precisely what the 4-R Act did: it prohibited long-standing constitutionally permissible discriminatory taxation practices. It did not -- indeed, could not -- make such discrimination unconstitutional.

Furthermore, the majority's analysis regarding the "findings" that Congress made that could support the

22

enactment of the instant legislation under the section five power is both flawed and untenable. The legislative history and judicial recognition referencing discrimination cannot transform what was admittedly a constitutionally permissible classification into an impermissible one. That railroads were "easy prey" which were subjected to higher rates of taxation than other taxable entities does not lead to the inescapable conclusion that the discrimination that the railroads suffered -- the disparate classification for taxation purposes -- rose to unconstitutional proportions. The majority has not pointed to any evidence that could support the conclusion that the disparate taxation to which railroads were subjected constituted a violation under the Equal Protection Clause, and as I have mentioned above, Congress made no explicit findings, as Flores instructs must be done. See Flores, 117 S. Ct. at 2169. The mere fact that the railroads were permissibly discriminated against for taxation purposes is insufficient. Disparate tax classifications concerning railroads were long-standing:

> That the states may classify property for taxation; may set up different modes of assessment, valuation and collection; may tax some kinds of property at higher rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate -- these are among the commonplaces of taxation and of constitutional law.

Browning, 310 U.S. at 368.

As no constitutional infraction has been shown, there is no issue to address concerning whether the sectionfive enforcement power can be employed to abrogate the States' sovereign immunity. More importantly, as there is no constitutional violation to remedy, interpreting S 11501 as the majority has is out of proportion to its remedial objective. "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect." Flores, 117 S. Ct. at 2164. Quite simply, there can be no congruence between the injury sought to be prevented in

this case and the sustaining of S 11501 under the Fourteenth Amendment section five enforcement power, because the injury involved in this case is simply not a constitutional injury.

Accordingly, after Seminole Tribe, and in the absence of any other legitimate constitutional grant of power, the Congressional intent to abrogate the States' sovereign immunity under the 4-R Act cannot be upheld as enacted pursuant to a valid exercise of power.6  See also Mills v. State of Maine, 118 F.3d 37 (1st Cir. 1997) (rejecting section five of the Fourteenth Amendment as a means to retain federal jurisdiction over FLSA claim against the State in post-Seminole Tribe context).

In addition to Flores, other recent holdings from our court also support my position that the 4-R Act cannot be upheld as a valid enactment pursuant to the section five enforcement power. See In re: Sacred Heart Hosp., 133 F.3d 237 (3d Cir. 1998);7 College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 131 F.3d 353 (3d Cir. 1997).8 While I acknowledge that these cases do not

_____

6. This, of course, does not mean that the statute, itself, is unconstitutional. Rather, it simply means that federal courts are without jurisdiction to adjudicate such claims against the States because the Eleventh Amendment proscribes them.

7. In Sacred Heart, we addressed the constitutionality of S 106(a) of the Bankruptcy Code, 11 U.S.C. S 106(a), which purports to abrogate state sovereign immunity in bankruptcy proceedings, in a post-Seminole Tribe context. As the Bankruptcy Clause is an Article I power, see U.S. Const. art. I, S 8, cl. 4, we held that it could not sustain an enactment abrogating a state's sovereign immunity after Seminole Tribe. In considering whether S 106(a) could have been properly enacted pursuant to section five of the Fourteenth Amendment, we held that there was no evidence to support such a construction. Accordingly, we concluded that S 106(a) was unconstitutional as it was not enacted pursuant to a legitimate exercise of Congressional power.

8. In College Savings Bank, we considered whether the district court properly dismissed a claim against the State of Florida brought under the Trademark Remedy Clarification Act of 1992 ("TRCA") for want of subject matter jurisdiction after Seminole Tribe. In affirming, we held that on the facts of that case jurisdiction could not be upheld pursuant to the section five power as a means to enforce the Due Process Clause of the Fourteenth Amendment as no protected property right was at issue.

24

concern railroads or the 4-R Act, they form the crux of the analysis which must obtain where an act legislated pursuant to some other congressional power, such as the commerce clause, is examined for whether it can be upheld as a valid enactment under the section five power.

The majority finds no incompatibility between its holding and the holdings of the aforementioned cases largely because of the different subject matters involved and "section 11501's legislative history and judicially recognized anti-discrimination purpose." Majority Op. at 10. In each of those cases, however, and contrary to the conclusion which the majority reaches, the respective courts held that such legislation could not be validly enacted pursuant to the section five power. Furthermore, as I have indicated above, the discrimination referenced in S 11501's legislative history and by various courts does not, by itself, render the discrimination the 4-R Act intends to prevent unconstitutional discrimination subject to enforcement under the section five power of the Fourteenth Amendment. The majority's view of the test for validity under section five of the Fourteenth Amendment is so permissive, "it is difficult to conceive of a principle that would limit congressional power." Flores, 117 S. Ct. at 2168.

Thus, I cannot join the majority of this panel in holding that this court retains subject matter jurisdiction over Wheeling's 4-R Act claims against the Commission. Notwithstanding that conclusion, Wheeling's claim for prospective declaratory and injunctive relief still survives against the individual Commissioners under the doctrine of Ex Parte Young -- a subject not addressed by the majority. See CSX Transp., Inc. v. Board of Public Works, ___ F.3d ___, No. 97-1296, 1998 WL 100394 (4th Cir. Mar. 10, 1998);9 Majority Op. at 7 n.7.

_____

9. Like the case before us, CSX Transportation v. Board of Public Works, ___ F.3d ___, No. 97-1296, 1998 WL 100394 (4th Cir. Mar. 10, 1998), involved a challenge by two railroads to a tax levied in violation of the 4-R Act. The district court dismissed the case for want of subject matter jurisdiction in light of Seminole Tribe, see supra at 4-5, but found no basis for jurisdiction over state officials under Ex Parte Young. While not addressing whether the 4-R Act could be properly enacted pursuant to

25

II.

A.

The district court held that the assessment levied against Wheeling for three (3) percent of the construction costs and for fifteen (15) percent of the future maintenance costs of the bridge constituted not only a tax under 49 S 11501(b)(4),10 but a discriminatory tax. I discuss the discriminatory character of the tax in Section II(B), infra.

A tax "raises money, contribute[s] to a general fund, and [is] spent for the benefit of the entire community." San Juan Cellular Tel. Co. v. Public Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992). By contrast, a fee is imposed for regulatory purposes generally by an entity upon those who are subject to its regulation. When it is unclear whether an assessment is a tax or a fee, courts

> emphasize the revenue's ultimate use, asking whether
> it provides a general benefit to the public, of a sort
> often financed by a general tax, or whether it provides

_____

the section five power of the Fourteenth Amendment, the Fourth Circuit reversed, holding that the members of the Board of Public Works could be enjoined from the collection of such illegal taxes under the doctrine of Ex Parte Young. Indeed, the Fourth Circuit resolved the issue of improperly assessed taxes not yet paid -- an issue which I have pointed out but have left open for this court to decide at a later time. See infra at 18. Hence, the analysis of the Fourth Circuit adopted in CSX Transportation coincides with my own in this case.

10. Section 11501(b)(4) states:

> (b) The following acts unreasonably burden and discriminate
> against interstate commerce, and a State, subdivision of a State,
or
> authority acting for a State or subdivision of a State may not do
any
> of them:
>
> . . .
>
>  (4) Impose another tax that discriminates against a rail carrier
> providing transportation subject to the jurisdiction of the Board
under
> this part.

49 U.S.C.A. S 11501(b)(4) (West 1997).

26

        more narrow benefits to regulated companies or defrays
        the agency's costs of regulation.

Id. (emphasis added). Support for this distinction between
taxes and regulatory fees is found in the Head Money
Cases, 112 U.S. 580 (1984), and Union Pacific Railroad
Company v. Public Utilities Commission, 899 F.2d 854 (9th
Cir. 1990), another case brought under the 4-R Act.

In those cases, the courts reasoned that the assessments
in question were used to finance the cost of the regulatory
programs regulating the immigration and railroad
industries, respectively. Therefore, the benefits from these
regulatory programs did not inure to the public-at-large but
only to the regulated industries. Accordingly, they did not
constitute taxes.

Thus, the majority's reliance upon these cases as
authority which would authorize the assessments made in
the instant case is misplaced. Those cases do no more than
hold that monies used for the benefit of the particular
industry do not necessarily benefit the public in general,
and thus cannot be deemed "taxes."

Here, considering the ultimate use of the monies
assessed by the Commission, I can only conclude-- as did
the district court -- that the assessments in question are a
tax which benefits the general public which uses the
bridge. Unlike a regulatory fee which would provide specific
benefits to Wheeling, the revenue from the instant
assessments was earmarked for a highway bridge that,
once repaired, would provide a general benefit to the public
at large.

It must be kept in mind that Wheeling's tracks are not
laid upon the bridge in question. Rather, Wheeling's tracks
run under the very bridge for which Wheeling has been
assessed and for which it is required to pay future
maintenance charges. Wheeling has been running its trains
under the bridge throughout the duration of the period that
the bridge has been closed.

In its amendment to the complaint before the
Commission, Scott Township conceded that the
construction and repair of the highway bridge was for the

benefit of the general public, not the railroads. Scott Township alleged:

> (4)(d) That the present design of the "Crooked Bridge" is dangerous and not conducive to meeting the needs of the Township and travelling [sic] public in the area.
>
> . . .
>
> (5)(e) That the bridge above [Wheeling] be replaced with one designed to meet the needs of the Township and travelling [sic] public.

Amend. to Compl. at 2-3 (emphasis added). These averments -- made by Scott Township -- are revealing. They disclose that the Township intended to repair the bridge (which as the record establishes, provides no benefit for Wheeling) not for the benefit of Wheeling but only for that of the general public.

The testimony of Patricia Wodnicki, the former manager/ secretary of Scott Township, supports this fact as well. At her deposition, Wodnicki testified that the bridge for which the assessment was imposed upon Wheeling had been closed by 1982. See Dep. Patricia Wodnicki at 7 (Dec. 11, 1995).[11] Notwithstanding that the bridge had been closed by 1982, there is no contention that interference had been had with Wheeling's railroad operations or that Wheeling's operations had been interrupted or impacted upon as a result of the bridge's condition. In fact, the Commission's Administrative Law Judge found that:

> If the highway is permanently closed and the bridge demolished, [Wheeling's] operations will not be affected. The proposed improvement will not result in any changes to [Wheeling's] operations nor will it provide [Wheeling] with any additional revenues.

Findings of Fact and Conclusions of Law (May 27, 1994). Furthermore, the repair of the bridge does not implicate any regulatory program regulating Wheeling's activities. Accordingly, because the assessment and maintenance

_____

11. The Amendment to Complaint and excerpts from the deposition of Patricia Wodnicki were submitted to the court by a letter dated September 12, 1997, after oral argument, upon the request of the court.

charges benefit only the general public and not specifically Wheeling, I conclude that the assessment levied upon Wheeling constituted a tax.

I believe the majority's reasoning which relies upon National Railroad Passenger Corporation v. Pennsylvania Public Utility Commission, 848 F.2d 436 (3d Cir. 1988)("Amtrak"), and Septa v. Pennsylvania Public Utility Commission, 826 F. Supp. 1506 (E.D. Pa. 1993) ("Septa"), aff 'd 27 F.3d 558 (3d Cir. 1994) (unpublished table decision), to identify when an assessment is a tax, is flawed.12 Those cases arise in a context different from the context of this appeal. Both cases involve a Congressional statute which exempted the railroad from any "taxes or other fees" imposed by any state. No definition of "taxes" or "fees" was furnished in either court's holding that a special assessment to pay for the construction and maintenance of identified bridges could not be charged against the railroads. Thus, their analyses cannot assist us in distinguishing between a tax which should be borne by the general public and a regulatory fee properly imposed upon a carrier, because the statutory framework of those two cases exempted the railroad from both taxes and fees. I therefore read these cases and their discussions and holdings to be inapposite.

B.

Because the majority has held that Scott Township's assessment does not constitute a tax, it has not addressed the issue of whether the tax is discriminatory. To determine whether this tax discriminates against Wheeling under S 11501, we must compare the effect of the tax upon a certain "comparison class" of other taxpayers.

Our sister courts in Atchison, Topeka & Santa Fe Railway

_____

12. Significantly, two cases on which the majority relies and which I find inapposite held that under a Congressional exemption statute, railroads could not be assessed construction and maintenance costs. See National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n, 848 F.2d 436 (3d Cir. 1988); Septa v. Pennsylvania Pub. Util. Comm'n, 826 F. Supp. 1506 (E.D. Pa. 1993).

Company v. Arizona, 78 F.3d 438 (9th Cir 1996), and Kansas City Railway Company v. McNamara, 817 F.2d 368 (8th Cir. 1987), have held that the comparison class to which a railroad such as Wheeling should be compared is that of "other commercial and industrial taxpayers." 78 F.3d at 441; 817 F.2d at 375. The Commission argues that because it has only limited jurisdiction to assess costs to a small group of entities that it would be inappropriate to compare its assessment on Wheeling to a class of all commercial and industrial taxpayers. Although we have yet to decide this issue, and as I have pointed out, the majority has not addressed it, I believe that the approach adopted by our sister courts in Atchison and Kansas City provides a logical and sensible rule of law.

If the comparison class were only those entities which were also taxed by the Commission, there would seldom, if ever, be any finding of discriminatory taxation. In Kansas City the court explained that

> [t]he only simple way to prevent tax discrimination against the railroads is to tie their tax fate to the fate of a large and local group of taxpayers. A large group of local taxpayers will have the political and economic power to protect itself against an unfair distribution of the tax burden.

817 F.2d at 375.

Given that I would adopt as the comparison class the group of commercial and industrial taxpayers, I must conclude that the tax at issue against Wheeling is a discriminatory tax. None of the parties disputes that industrial and commercial taxpayers were not subjected to the tax assessment for the repair and reconstruction of the highway bridge. As a result, I would affirm the district court's ruling of discrimination as well.

III.

Wheeling seeks both declaratory and injunctive relief. As I would hold that after the Supreme Court decided Seminole Tribe, this court no longer has subject matter jurisdiction over the 4-R Act to hear cases involving the Commission, I

30

am obliged to address the issue of whether the individual Commissioners may be sued under the doctrine of Ex Parte Young, 209 U.S. 123 (1908). As I have noted, the majority has not dealt with this issue. See supra at 8-9.

The doctrine of Ex Parte Young permits suits against state officials acting in their official capacity -- notwithstanding the States' immunity under the Eleventh Amendment -- if the suit seeks prospective declaratory and/or injunctive relief. It does not allow suits for retrospective relief. See Edelman v. Jordan, 415 U.S. 651 (1974).

Wheeling has not yet paid the discriminatory taxes it was assessed regarding the construction of the bridge. Wheeling thus contends that it is seeking prospective relief because the assessment would have to be paid in the future. In addition, Wheeling asserts that because the future maintenance costs have not yet been assessed, the relief it requests is prospective in nature. By contrast, the Commissioners claim that the Commission's order assessing costs to Wheeling became final when Wheeling appealed the Commission's order. The Commissioners argue that if this court were to grant Wheeling relief, we would have to hold the Commission's order -- a past act -- invalid, and that such would be contrary to Eleventh Amendment doctrine.

The issue of prospectivity is a difficult one. I have no problem holding that Wheeling is entitled to the prospective declaratory and injunctive relief concerning the future maintenance costs. Although the tax liability has already been determined, the Commissioners have not yet assessed those taxes. Accordingly, this court would merely be enjoining the state actors from assessing future taxes, and that would fall comfortably within the Ex Parte Young doctrine.

With respect to the taxes assessed against Wheeling for the construction of the bridge, however, the prospectivity issue is less clear, and I am troubled by the Commission's claim that there is no remedy or relief available to Wheeling for the construction assessment made against it, despite Wheeling's consistent and continual challenge to that assessment as a discriminatory tax.

31

Since we have heard oral argument, the Fourth Circuit has directly addressed this issue in CSX Transportation, Inc. v. Board of Public Works, ___ F.3d ___, No. 97-1296, 1998 WL 100394 (4th Cir. Mar. 10, 1998). Upholding jurisdiction over state officials under the Ex Parte Young doctrine, the Fourth Circuit held that "[a]n injunction against the future collection of the illegal taxes, even those that already have been assessed, is prospective, and therefore available under the Ex parte Young [sic] doctrine." Id. at 3 (emphasis added). "The point is that the future collection[of the taxes] is illegal." Id. at 6. Thus, under CSX Transportation, it is within the power of the court to enjoin as prospective relief improperly assessed -- though not yet paid -- taxes.

As I am in dissent and my opinion on the issue of prospectivity is without precedential authority, I leave the resolution of this issue for another day. Nevertheless, I would be inclined to hold that Eleventh Amendment doctrine would permit relief where a mere assessment without payment of the charge has occurred -- as it has here -- and the Fourth Circuit has led the way by holding so in CSX Transportation.

IV.

In sum, I disagree with the majority's opinion in its entirety.

I would hold that this court is without subject matter jurisdiction to hear suits against the Commission after Seminole Tribe. Nonetheless, Wheeling would be entitled to prospective declaratory and injunctive relief under the doctrine of Ex Parte Young.

I would also hold that the assessment against Wheeling is a tax because it is for the general benefit of the public, and not for the narrow benefit of the railroad or to achieve some regulatory purpose.

I would further hold that the tax is discriminatory because the comparison class of commercial and industrial taxpayers was not assessed the tax for construction or future maintenance costs.

32

Finally, I would hold that Wheeling is entitled to prospective declaratory and injunctive relief from any assessment relating to the future maintenance costs of the bridge, although as I have indicated above, I do not decide at this time whether relief from the Commission's order levying the cost of construction of the bridge to Wheeling constitutes prospective or retrospective relief.

I therefore respectfully dissent from the majority's holdings.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

33