**NATIONAL RAILROAD PASSENGER
CORPORATION**

v.

**COMMONWEALTH OF PENNSYLVA-
NIA PUBLIC UTILITY COMMISSION
and Township of Tredyffrin.**

**Appeal of TOWNSHIP OF
TREDYFFRIN.**

**Appeal of COMMONWEALTH OF
PENNSYLVANIA PUBLIC
UTILITY COMMISSION.**

**Nos. 87–1445, 87–1446.**

United States Court of Appeals,
Third Circuit.

Argued March 7, 1988.

Decided June 6, 1988.

As Amended June 21, 1988.

William H. Lamb, Lamb, Windle & McEr-
lane, P.C., West Chester, Pa., for Tredyff-
rin Tp.

John J. Gallagher (argued), Asst. Coun-
sel, John B. Wilson, Deputy Chief Counsel,
Daniel P. Delaney, Chief Counsel, Harris-
burg, Pa., for Pennsylvania Public Utility
Com'n.

Peter S. Craig (argued), Dennis M.
Moore, Christopher M. Klein, Washington,
D.C., Harold K. Cohen, National R.R. Pas-
senger Corp., Philadelphia, Pa., for appel-
lee National R.R. Passenger Corp.

Laurence Z. Shiekman, Richard A. Le-
van, Robert S. Natalini, Pepper, Hamilton
& Scheetz, Philadelphia, Pa., Donald A.
Brinkworth, John F. Fansmith, Jr., Daniel
F. Donovan, of counsel, for amicus curiae
Consolidated Rail Corp.

Stephen F.J. Martin, Herbert G. Zahn,
Asst. Counsels, Robert H. Raymond, Jr.,
Asst. Chief Counsel, John L. Heaton, Chief
Counsel, Office of Chief Counsel, Dept. of
Transp., Com. of Pennsylvania, Harrisburg,
Pa., for amicus curiae Com. of Pennsylva-
nia, Dept. of Transp.

Before WEIS, GREENBERG and ALDISERT, Circuit Judges.

### OPINION OF THE COURT

WEIS, Circuit Judge.*

Congress granted Amtrak an exemption from "any taxes or other fees imposed by any State." 45 U.S.C. § 546b. On this appeal, we consider whether that statute covers a special assessment levied by a state agency for the construction of railroad grade crossing improvements. The district court held the exemption applied and entered summary judgment sustaining Amtrak's challenge to the assessment. We will affirm.

The pertinent facts are not in dispute. Following state administrative proceedings, the Pennsylvania Public Utility Commission directed Amtrak to pay approximately twenty percent of the cost of replacing a bridge situated in Tredyffrin Township, Pennsylvania. The existing bridge, constructed in 1899 by the Pennsylvania Railroad Company, carries Cassatt Avenue over tracks owned and presently used by the National Railroad Passenger Corporation (Amtrak).[1] The remaining eighty percent of the reconstruction expense was allocated to Tredyffrin Township which, in turn, would be reimbursed by the state. The Commission also ordered Amtrak to assume certain maintenance costs of the proposed new bridge and adjoining pedestrian walkway.

Amtrak challenged the Commission's order as inconsistent with the tax exemption granted it by Congress in 45 U.S.C. § 546b. The Commission rejected this argument *sub silentio.* Amtrak then sought declaratory and injunctive relief in the district court. Both parties filed cross-motions for summary judgment.

Reviewing the legislative history of Amtrak's tax exemption, the district court de-

termined that the statute was designed to "guarantee Amtrak's fiscal integrity, and indeed its survival." *National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,* 665 F.Supp. 402, 411 (E.D.Pa. 1987). The Act creating Amtrak demonstrated "a federal commitment to maintain and improve rail passenger service, federal controls over Amtrak management and operations and federal financial support for Amtrak." *Id.*

Against this background, the court decided that it "would be inappropriate to undermine those goals through the too stingy construction of the exemption offered by defendants." *Id.* Holding that the statutory exemption found in section 546b included an order by the Commission to pay an assessment, the court entered judgment for Amtrak. The Township and Commission defendants both appealed, and their cases were consolidated.

Defendants mount two arguments. First, they contend that the Commission's assessment was a valid exercise of the state's police power to enforce safety at grade crossings. Alternatively, they argue that the assessment is not a tax within the meaning of section 546b. The district court rejected the police power—safety argument as being "of no moment." We agree. The issue in this case does not hinge on the power of the state to enforce safety measures at grade crossings, and plaintiff does not challenge the state's authority in that area. Rather, the dispositive question is whether the federal statute at issue here exempts Amtrak from underwriting the safety measures the Commission ordered. The answer rests on statutory construction.

The conditions which prompted Congress' creation of Amtrak were described by the Supreme Court in *National R.R. Passenger Corp. v. Atchison, Topeka &*

---

* At the time of oral argument on this case, the Honorable Joseph F. Weis, Jr., was an active circuit judge. Since that time, Judge Weis has assumed senior status.

1. The district court noted that freight trains operated by the Consolidated Rail Corporation (Conrail) and commuter trains operated by the

Southeastern Pennsylvania Transportation Authority (SEPTA) also use these tracks. However, both operators pay Amtrak for the right to use its rails. *National R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n,* 665 F.Supp. 402, 404 n. 4 (E.D.Pa.1987).

*Santa Fe Ry.,* 470 U.S. 451, 453–57, 105 S.Ct. 1441, 1445–47, 84 L.Ed.2d 432 (1985). In 1929, approximately 20,000 intercity trains rode the rails in this country. That number diminished to about 11,000 in 1946 and, by 1971, to fewer than 500. Those railroads which continued to carry passengers incurred heavy and continuing losses, prompting requests for regulatory approval to discontinue service. The passenger coach, once a vibrant force in American cultural and economic life, seemed destined to take its place in the transportation museum alongside the stagecoach and sidewheeler.

In an effort to revive the failing intercity passenger lines, Congress enacted the Rail Passenger Service Act in 1971, 45 U.S.C. §§ 501–658, establishing the National Railroad Passenger Corporation, a private corporation better known by its official nickname "Amtrak." The Corporation is not "an agency or establishment" of the federal government, but is authorized by the government to provide intercity rail passenger service. *Atchison, Topeka & Sante Fe Ry,* 470 U.S. at 454–55, 105 S.Ct. at 1445–46.

Despite massive federal subsidies, Amtrak's financial picture was bleak. In 1979, Congress directed the Secretary of Transportation to study Amtrak's liability for payment of taxes to state and local governments. In his 1980 report, the Secretary estimated that these taxes would cost Amtrak more than $14 million in the next year. S.Rep.No. 253, 97th Cong., 1st Sess. 103 (1981). The Secretary concluded that "State and local taxes on a primarily Federal investment are inappropriate." *Id.*

The Senate Appropriations Committee agreed, reasoning that "such taxation serves to erode the revenue-to-cost ratios which impact on whether States and localities continue to receive the benefits of Amtrak service." *Id.* The Committee disapproved the process through which federal subsidies were used to provide tax windfalls to states and localities. Subsequently, Congress deferred for one year Amtrak's payment of any state or local taxes. Pub. L. No. 97–102, 95 Stat. 1442, 1451 (1981).

Congress reviewed the matter again the following year and converted Amtrak's temporary exemption into a continuing one. A Senate Committee Report commented that "there are many parts of the country which would gladly pay an amount equal to local or State taxes owed by Amtrak in order to have the benefit of Amtrak service." S.Rep. No. 516, 97th Cong., 2d Sess. 170 (1982), *quoted in National R.R. Passenger Corp. v. New Castle County,* 633 F.Supp. 354, 357 (D.Del.1986). The Report concluded: "At a time when local jurisdictions are demanding that nationwide rail passenger service be maintained, it seems reasonable to provide for a 'user contribution' whereby those areas receiving the service in turn contribute to Amtrak's continued existence through tax relief." *Id., quoted in New Castle County,* 633 F.Supp. at 358.

The applicable statutory provision, codified at 45 U.S.C. § 546b, reads: "Notwithstanding any other provision of law, the National Railroad Passenger Corporation (the 'Corporation') shall be exempt from any taxes or other fees imposed by any State, political subdivision of a State, or local taxing authority which are levied on the Corporation, or any railroad subsidiary thereof, from and after October 1, 1981...."

The precise issue here is whether the phrase "any taxes or other fees" contained in this statute covers charges of the nature levied against Amtrak for building and maintaining the Cassatt Avenue bridge. Although not so labeled, the payments demanded of Amtrak in this case are similar to "special assessments" exacted by local municipalities to finance such projects as the construction and upkeep of streets, sidewalks, and sewers. Whether such "special assessments" will be construed as "taxes" depends on the context in which the terms are raised.

In *Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371 (3d Cir.1978), we decided that the phrase "any tax" in the Tax Injunction Act, 28 U.S.C. § 1341, must be interpreted to include a Philadelphia ordinance imposing a special

assessment on users of the City's underground alarm system wires. In reaching our conclusion, we explained that the meaning of the word "tax" was a matter of federal law deduced from congressional policy underlying the statute, rather than from state tax labels developed in an entirely unrelated legal context. *Id.* at 374. *Accord Wright v. McClain,* 835 F.2d 143, 144 (6th Cir.1987). *See also Carpenter v. Shaw,* 280 U.S. 363, 367–68, 50 S.Ct. 121, 122–23, 74 L.Ed. 478 (1930); *Tramel v. Schrader,* 505 F.2d 1310, 1314–16 (5th Cir. 1975).

However, the Court of Appeals for the Eighth Circuit, in constricting the Federal Reserve Bank's waiver of immunity from local taxes "except taxes upon real estate," 12 U.S.C. § 531, held that a special assessment would not qualify as a real estate "tax". *Federal Reserve Bank v. Metrocentre Improvement Dist. No. 1,* 657 F.2d 183 (8th Cir.1981), *aff'd,* 455 U.S. 995, 102 S.Ct. 1625, 71 L.Ed.2d 857 (1982). The court stated that "where there is federal immunity from taxation, Congress must express a clear, express, and affirmative desire to waive that exemption." *Id.* at 186. Although not entitled to immunity from "taxes on real estate," the Federal Reserve bank as an instrumentality of the United States government would enjoy an exemption from local "assessments". *Id.* at 186–87. *See John K. & Catherine S. Mullen Benevolent Corp. v. United States,* 290 U.S. 89, 54 S.Ct. 38, 78 L.Ed. 192 (1933); *United States v. City of Adair,* 539 F.2d 1185 (8th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977).

Still another variation on this special assessment-tax distinction appears in *Illinois Central R.R. v. Decatur,* 147 U.S. 190, 13 S.Ct. 293, 37 L.Ed. 132 (1893). In that case, a state statute granted an exemption to a private railroad "from all taxation under the laws of this State until sold." The Court held that this exemption would not extend to a county "assessment" against the railroad to defray the costs of grading and paving an adjacent street. The Court turned first "to the language employed in granting this exemption to see what the legislature intended." *Id.* at 203,

13 S.Ct. at 296. The state of Illinois seldom, if ever, appropriated money for local improvements, the Court found, and thus the exemption "must be held to contemplate a release, only as to such charges as would ordinarily find their way into the state treasury for legislative appropriation." *Id.* at 204, 13 S.Ct. at 296. That reasoning followed the rule widely accepted among the states that an exemption from taxation usually does not apply to special assessments that theoretically increase the value of the affected property.

From these cases some general rules emerge. When a tax exemption is granted to certain private entities, the statutory language is construed closely because it affords a special privilege not available to others. Likewise, when a statute waives the federal government's freedom from local taxation, that language is also narrowly construed because it defeats the immunity shielding the federal government. In interpreting an exemption statute, the intention of the legislative body is pivotal. Moreover, as *Decatur* illustrates, the fact that expenditures for local improvements are financed solely by municipalities without assistance from the state legislature may be an element in determining whether special assessments qualify as a tax. These factors are helpful in construing section 546b.

Initially, we examine the status of Amtrak. Although the statute provides expressly that Amtrak is neither "an agency or establishment of the United States Government," 45 U.S.C. § 541, the Corporation also is obviously not an ordinary private firm. Its Board of Directors consists of nine individuals, including the Secretary of Transportation ex officio, three members appointed by the President with Senate confirmation, and two members selected by the President from a list compiled by commuter authorities. *Id.* § 543. Compensation for the officers is set by a schedule formulated by Congress. *Id.* § 544.

The United States owns the railroad's preferred stock which is specifically not subject to the annual fee of the District of

Columbia *or to "any other form of taxation." Id.* Congress appropriates sums for capital improvement and subsidies to replace revenue deficiencies, periodically adjusts Amtrak's regulatory scheme, and designates the national rail route system. *Id.* §§ 541–658.

It is not necessary to decide here whether Amtrak is an "instrumentality" of the federal government; the unique structure and mission of the Corporation are sufficient to remove it from the realm of purely private entities. Consequently, we need not assume that the customary presumption of obligation to pay state and local taxes applies to the Corporation. To the contrary, the signals point the other way. The House Committee on Energy and Commerce said that Amtrak was to be exempt from payment of "all state and local taxes, *including but not limited to* property taxes, income and franchise taxes, sales taxes, gross revenue taxes, fuel taxes, licenses and other fees, *to the same extent as the United States is exempt* from the payment of such taxes or other fees." H.R.Rep. No. 81, 97th Cong., 1st Sess. 21 (1981), *quoted in* 665 F.Supp. at 405 n. 7 (emphasis supplied).

As a consequence of Amtrak's federal ties, we must apply the rule compelling a liberal construction of a governmental exemption and we will interpret the statutory language in a manner consistent with federal immunity from local taxes. The apportionment between state and local funding which influenced the *Decatur* decision is not implicated here. Rather, the principles of federal supremacy guide us.

■ The statute's text, its legislative history, and analogous caselaw persuade us to give the exemption in section 546b a broad interpretation that fulfills the intent of Congress. That intention is clear—to impose a passenger rail "user fee" on state and local governments. It would be manifestly inconsistent with that design to make Amtrak pay for related local improvements in the many instances where the states could, and would, impose them. Therefore, we hold that Amtrak's immunity from local "taxes or other fees" in section

546b extends to assessments for local improvements of the kind at issue here.

Accordingly, we will affirm the judgment of the district court.