OPINION OF THE COURT
NYGAARD, Circuit Judge.
In this appeal we must decide whether assessing a railroad for a portion of the construction and maintenance costs of a bridge intersecting its right-of-way constitutes a discriminatory tax under the Railroad Revitalization and Regulatory Reform (4-R) Act of 1976, 49 U.S.C. § 11501.[1] The district court held that the assessment was a discriminatory tax. We will reverse.
I. Background
The Wheeling & Lake Erie Railway Company subleases a railroad right-of-way passing under “Old Washington Pike” in Scott Township, Allegheny County, Pennsylvania. The bridge supporting that highway became so deteriorated that it was closed in 1982. The Township procured the necessary approvals from the Pennsylvania Public Utility Commission and constructed a new bridge at the Township’s initial expense. The Com *91 mission then ordered Wheeling to pay 3% of the total construction costs of the bridge replacement project and 15% of the maintenance costs of the new bridge (excluding costs of snow and ice removal).[2] The Commission also assessed another railroad, whose tracks pass under the same span, 3% and 15% respectively. That railroad is not a party. The Pennsylvania Department of Transportation was to pay 7% of the construction costs. The Township was to pay the remaining 87% of the construction costs and 70% of the maintenance costs, with an 80% reimbursement for construction costs coming from Pennsylvania’s Billion Dollar Bridge Project Fund.
Wheeling filed this action requesting declaratory and injunctive relief from the construction and maintenance costs. It argued that the assessment was a discriminatory tax in violation of the 4-R Act. All parties filed motions for summary judgment. In its order granting Wheeling’s motion, the district court declared that the assessment was an unlawfully discriminatory tax under the 4-R Act. The court also enjoined the defendants from assessing or collecting the construction and maintenance costs from Wheeling. The Commission and the Township appealed separately. We consolidated the appeals.
II. Eleventh Amendment Immunity
The Commission did not raise its Eleventh Amendment[3] argument before the district court. Nonetheless, Eleventh Amendment immunity can properly be raised for the first time on appeal. See Edelman v. Jordan, 415 U.S. 651, 658, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974) (“the Eleventh Amendment sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court”); Bolden v. Southeastern Pa. Trans. Auth., 953 F.2d 807, 812 (3d Cir.1991).
The Eleventh Amendment bars suits against unconsenting states in federal courts. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 53-54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). There are two exceptions: Congress may abrogate a state’s immunity, id., and parties may sue state officers for prospective injunctive and declaratory relief. See Idaho v. Coeur d’Alene Tribe of Idaho, — U.S.-,-, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997); Seminole, 517 U.S. at 72-74, 116 S.Ct. at 1132; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Balgowan v. New Jersey, 115 F.3d 214, 217 (3d Cir.1997). Here, the parties do not dispute that the Pennsylvania Public Utility Commission is an arm of the Commonwealth of Pennsylvania protected by Eleventh Amendment principles of sovereign immunity.[4] Also, Pennsylvania has not given its consent to be sued in federal court.[5] The *92 question remaining is whether any exceptions to immunity apply.
A. Congressional Abrogation of Immunity
A valid abrogation of Eleventh Amendment immunity requires Congress to “unequivocally express[ ] its intent to abrogate the immunity” and to act “pursuant to a valid exercise of power.” Seminole, 517 U.S. at 55, 116 S.Ct. at 1123 (quoting Green v. Mansour, 474 U.S. 64, 68,106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)). Here, the parties agree that section 11501(c)[6] is an unmistakably clear expression of Congress’s intent to abrogate states’ immunity regarding violations of section 11501(b). However, the parties disagree on whether the statute is a valid exercise of congressional power.
The dispute centers largely around Seminole, which overruled Pennsylvania v. Union Gas Co., 491 U.S. 1, 23, 109 S.Ct. 2273, 2286, 105 L.Ed.2d 1 (1989) (holding that Congress could validly abrogate a state’s sovereign immunity pursuant to its Commerce Clause powers). In Seminole, the Court noted that it had previously recognized only one other source of congressional power to abrogate states’ sovereign immunity—the Fourteenth Amendment. Seminole, 517 U.S. at 58-60, 116 S.Ct. at 1125 (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). Thus, after Seminole, the only remaining source of congressional power to abrogate states’ Eleventh Amendment immunity is the Fourteenth Amendment.
Congress promulgated the 4-R Act pursuant to its Commerce Clause powers because of the interstate nature of the railroad industry. Section 11501 announces Congress’s concern that discriminatory taxation “unreasonably burden[s] and discriminate[s] against interstate commerce.” 49 U.S.C. § 11501(b); see also 49 U.S.C. § 10101 (listing the purposes and policies of railroád regulatioh). However, when determining the sources of Congress’s authority to legislate, we may look beyond the expressed constitutional basis in a statute’s preamble or legislative history. See Fullilove v. Klutz-nick, 448 U.S. 448, 478, 100 S.Ct. 2758, 2774-75, 65 L.Ed.2d 902 (1980). The Supreme Court directs us to:
“proceed to the consideration whether [§ 11501] is. ‘appropriate legislation’ to enforce the Equal Protection Clause, that is ... whether [§ 11501] may be regarded as an enactment to enforce the Equal Protection Clause, whether it is ‘plainly adapted to that end’ and whether it is not prohibited by but is consistent with ‘the letter and spirit of the constitution.’ ”
Katzenbach v. Morgan, 384 U.S. 641, 651, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828 (1966). In a later examination of Morgan, the Court established that to answer this inquiry:
“[i]t was enough that the Court could perceive a basis upon which Congress could reasonably predicate a judgment that application of literacy qualifications within the compass of § 4(e) would discriminate in terms of access to the ballot and consequently in terms of access to the provision of administration of government programs.”
Fullilove, 448 U.S. at 477, 100 S.Ct. at 2774 (citing Morgan, 384 U.S. at 652-53, 86 S.Ct. at 1724-25).[7]
The legislative history of the statute before us shows “Congress was aware that the railroads ‘are easy prey for State and local tax assessors’ ” in that they are “nonvoting, often nonresident, targets for local taxation,” who cannot easily remove themselves from the *93 locality.’ ” Department of Rev. of Or. v. ACF Indus., 510 U.S. 332, 336, 114 S.Ct. 843, 847, 127 L.Ed.2d 165 (1994) (quoting Western Air Lines, Inc. v. Board of Equalization, 480 U.S. 123, 131, 107 S.Ct. 1038, 1043, 94 L.Ed.2d 112 (1987) (quoting S.Rep. No. 91-630, at 3 (1969))). Moreover, another court of appeals has held that the very purpose of section 11501 was to remedy discrimination against railroads:
“Until this law was passed, as pointed out by the appellants, states could constitutionally classify railroads differently from all other taxpayers for the imposition of state taxes without violating the equal protection clause of the Fourteenth Amendment. It was the obvious purpose of Congress to put an end to this practice, where such treatment of the railroads as a class was discriminatory in effect.”
Alabama Great S. R.R. Co. v. Eagerton, 663 F.2d 1036, 1040 (11th Cir.1981) (emphasis added). The Supreme Court has also said that “[c]orreetly viewed, § 5 [of the Fourteenth Amendment] is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment.” Morgan, 384 U.S. at 651, 86 S.Ct. at 1723-24.
It is evident to us that Congress recognized the potential for state and local taxing authorities to discriminate against railroads in violation of their Equal Protection rights under the Fourteenth Amendment. We conclude that Congress had the power, pursuant to Section Five of the Fourteenth Amendment, to promulgate section 11501, and did so to protect the railroads. Therefore, Congress validly abrogated Eleventh Amendment immunity, and the district court properly exercised jurisdiction over this lawsuit.
Neither our analysis nor our conclusion is affected by the recent decisions cited by the Commission. It cites Wilson-Jones v. Caviness, 99 F.3d 203 (6th Cir.1996), as employing the correct post-Seminole analysis for determining whether an act of Congress, generally regarded to be within its Commerce Clause powers, can also be justified by the Fourteenth Amendment. The Commission reads Wilson-Jones to hold that, barring an explicit congressional recitation of authority under the Fourteenth Amendment, only statutes that remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection can be regarded as enactments to enforce the provisions of the Fourteenth Amendment.
We disagree with this narrow reading of Wilson-Jones. There, the Court found no evidence that the core provisions of the Fair Labor Standards Act, before being amended by the Equal Pay Act, were enacted pursuant to Section Five of the Fourteenth Amendment. Although the Court feared the implications of an expansive rule “that an act is valid [merely] if it is rationally related to achieving equal protection of the laws,” it expressly admitted that its “opinion might be different if Congress made findings that a particular group needed legal protection to remedy some sort of invidious discrimination not directly addressed by federal precedent.” Wilson-Jones, 99 F.3d at 209, 210 n. 4. Here, however, the remedial nature of section 11501’s constitutional protection is evident, despite the lack of an explicit congressional statement. We believe that Congress was within its discretion when it found that railroads need special protection from local tax assessors. Therefore, we reach a different conclusion than the Court in Wilson-Jones.[8]
Nor is our result affected by City of Boerne v. Flores, — U.S. -, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), in which the Supreme Court declared the Religious Freedom Restoration Act unconstitutional. The Court found that the Act was “so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections.” Id. at -, 117 S.Ct.. at 2170. In so holding, the Court reasoned that “[i]f Congress could define its own powers by altering the Fourteenth Amendment’s mean *94 ing,” it would be “difficult to conceive of a principle that would limit congressional power.” Id. at —, 117 S.Ct. at 2168. Here, section 11501 is not out of proportion to its objective, nor does it substantively change any constitutional protections.
We recently decided College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 131 F.3d 353 (3d Cir.1997), in which we held that the right to be free of false advertising is not a constitutionally protected intangible property right. Therefore, the Due Process Clause of the Fourteenth Amendment was not implicated, and we concluded that the Trademark Remedy Clarification Act of 1992 did not abrogate Florida’s immunity because it did not further the purposes of the Fourteenth Amendment. College Savings Bank, however, was expressly limited to its facts, id. at 361-62, and did not concern the Equal Protection Clause. It does not contradict our decision. Similarly, there is no dissonance between our decision in In re Sacred Heart Hospital of Norris-town, 133 F.3d 237 (3d Cir.1998), and our decision here. In Sacred Heart, we did not distinguish between the Bankruptcy Clause and the Commerce Clause (both Article I powers) as being inappropriate sources of congressional power to abrogate states’ Eleventh Amendment immunity. Id. at 242-43. Further, we found “no evidence suggesting that § 106(a) [of the Bankruptcy Code] was enacted pursuant to any constitutional provision other than Congress’ Bankruptcy Clause power.” Id. at 244. Here, however, we have found such evidence in section 11501’s legislative history and judicially-recognized anti-discrimination purpose.
In sum, section 11501 is a valid exercise of congressional power under Section Five of the Fourteenth Amendment, thus effectively abrogating the Commission’s Eleventh Amendment immunity.[9] We now turn to the merits of the appeal.
III. The 4-R Act
Wheeling argues that the assessment of construction and maintenance costs violates section 11501 because it is an illegal tax that discriminates against railroads.[10] The district court agreed, concluding that the assessments were “taxes” within the meaning of section 11501. Because this issue involves the interpretation of federal statutory law, our review is plenary. See In re TMI, 89 F.3d 1106, 1112 (3d Cir.1996). Unfortunately, the 4-R Act does not define “tax.” We must, therefore, begin by determining the appropriate rule of construction.
In Department of Revenue of Oregon v. ACF Industries, 510 U.S. 332, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994), the Court held that nonrailroad property tax exemptions were not prohibited by subsection (b)(4).
‘When determining the breadth of a federal statute that impinges upon or pre-empts the States’ traditional powers, we are hesitant to extend the statute beyond its evident scope. We will interpret a statute to preempt the traditional state powers only if that result is ‘the clear and manifest purpose of Congress.’ ”
Id. at 345, 114 S.Ct. at 850-51 (citations omitted).
We have decided two cases dealing with the statutory interpretation of “taxes” in a similar context. In National Railroad Passenger Corp. v. Pennsylvania Public Utility Commission, 848 F.2d 436 (3d Cir.1988) *95 [hereinafter Amtrak ], the issue was whether “any taxes or other fees” covered levies against Amtrak for building and maintaining the Cassatt Avenue bridge. Id. at 438 (interpreting 45 U.S.C. § 546b (recodified at 49 U.S.C. § 24301(Z))). That decision outlined the declining history of intercity rail passenger service in America and Congress’s efforts to revitalize it. Id. at 438. Congress rationalized Amtrak’s exemption by theorizing that cities would gladly pay a user contribution to maintain rail passenger service. Id. In Amtrak, we reasoned, “[w]hether such ‘special assessments’ will be construed as ‘taxes’ depends on the context in which the terms are raised.” Id. Additionally, we instructed that “the meaning of the word ‘tax’ is a matter of federal law deduced from congressional policy underlying the statute, rather than from state tax labels developed in an entirely unrelated legal context.” Id. at 439. After noting that exemptions from taxation usually do not apply to such assessments, we adopted some general rules:
“When a tax exemption is granted to certain private entities, the statutory language is construed closely because it affords a special privilege not available to others. Likewise, when a statute waives the federal government’s freedom from local taxation, that language is also narrowly construed because it defeats the immunity shielding the federal government. In interpreting an exemption statute, the intention of the legislative body is pivotal.”
Id. Amtrak, we concluded, was not an ordinary private firm; Congress intended it to be exempt from state and local taxes and fees to the same extent as the federal government. Thus, under a liberal reading of that statute, the bridge assessment was within the meaning of the statutory phrase “taxes or other fees.” Id. at 439-40.
Likewise, in Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission, 826 F.Supp. 1506 (E.D.Pa.1993) [hereinafter SEPTA ], affd 27 F.3d 558 (3d Cir.1994) (unpublished table decision), the same issue arose under a different statute, which confers Amtrak’s tax immunity upon certain commuter authorities. See 49 U.S.C. § 24501(g). The district court found that Congress intended the phrase “taxes or other fees” in section 24501(g) to have the same broad meaning as our Amtrak decision found Congress to have given to identical language in section 24301(Z). Id. at 1525-26.
Amtrak and SEPTA involved the interpretation of statutes with different purposes and histories from the statute at issue here. Nonetheless, we believe the reasoning underlying those cases is instructive regarding the principles of statutory construction applicable here. The statutes in Amtrak and SEPTA were construed broadly because those entities had tax immunity comparable to that of the federal government. In contrast, we must interpret section 11501 strictly here; because Wheeling is a private entity benefitting from a special provision exempting it from discriminatory taxation. Thus, we must consider the context in which the term “tax” , is raised and the congressional policy underlying section 11501 to determine if it was the clear and manifest purpose of Congress to include such assessments within that provision.
As the Commission, Scott Township, and the Department of Transportation all point out, there is nothing iri the legislative history that sheds light on what Congress meant by the word “tax” in section 11501(b)(4). See generally Alabama Great S. R.R. Co. v. Eagerton, 663 F.2d 1036, 1041 (11th Cir.1981). Moreover, they maintain that because assessing railroads for such improvements was commonplace when the 4-R Act was enacted and Congress did not address that practice in either the Act or the legislative history, then Congress did not intend “tax” to include bridge assessments. This argument parallels the Supreme Court’s reasoning in ACF regarding ad valorem tax exemptions:
“It was common at the time [§ 11501] was drafted, as it is now, for States with generally applicable ad valorem property taxes to exempt various classes of commercial property.... Given the prevalence of property tax exemptions when Congress enacted the 4r-R Act, [§ 11501’s] silence on the subject—in light of the explicit prohibition of tax rate and [tax] assessment ratio discrimination—reflects a determination to *96 permit the States to leave their exemptions in place.”
ACF, 510 U.S. at 344, 114 S.Ct. at 850.
Another court followed this reasoning in Chicago & North Western Transportation Co. v. Webster County, 71 F.3d 265 (8th Cir.1995). There, the County Board of Supervisors was expanding a drainage ditch running under a railroad’s right-of-way. The County ordered the railroad to install a larger culvert under its tracks. When the railroad refused, the County installed the culvert anyway, and assessed the cost against the railroad. The Court found that the culvert solely benefitted the railroad because it kept the railroad’s right-of-way intact: the Supervisors could have legally bulldozed a wider ditch through the right-of-way, resulting in the same benefit to the public. The Court also noted that before the passage of the 4-R Act:
“many states had statutes requiring railroads to construct improvements, including culverts, when drainage ditches crossed their rights-of-way----
These statutes represent the juridical background against which Congress passed the 4-R Act, and nothing in either its language or its legislative history indicates that Congress wanted to upset or undermine state drainage laws. Congress did not express an intent to preempt the states’ longstanding and common practice of charging railroads for certain drainage improvements, and we refuse to impute that intent into § [11501(b)(4) ], given the historical environment in which it was enacted.”
71 F.3d at 267-68. Here, the statutes giving the Commission the powers to order the construction and assess the costs of railroad crossing improvements date back to 1913. See 66 Pa. Cons.Stat. Ann. §§ 2702, 2704 (historical notes). Like the ad valorem tax exemptions in ACF and the culvert assessment in Chicago & North Western, assessing bridge improvement costs in Pennsylvania was a longstanding practice when Congress enacted the 4-R Act. Thus, we are convinced that the congressional policy underlying section 11501 was not to treat bridge assessments as taxes. ■ We conclude that it was not the clear and manifest purpose of Congress to include bridge assessments within the meaning of the word “tax” in section 11501(b)(4).
This conclusion is consistent with our comments in Amtrak that such assessments are usually not considered within exemptions from taxation. 848 F.2d at 439. There, we found support in an early Supreme Court case reaching a similar conclusion:
“The charges here [costs of grading and paving a street] are not taxes proper, are not contributions to the state or to the city for the purpose of enabling either to carry on its general administration of affairs, but are charges only, and specially, for the cost for a local improvement supposed to have resulted in an enhancement of the value of the railroad company’s property.”
Illinois Cent. R. Co. v. Decatur, 147 U.S. 190, 208-209, 13 S.Ct. 293, 298, 37 L.Ed. 132 (1893) (cited by Amtrak, 848 F.2d at 439). Importantly, the amount assessed here does not raise revenue for the general fund of either the Township or the Commonwealth. (J.A. at 266-68)
Our conclusion is also consistent with the progeny of the Head Money Cases (Edye v. Robertson), 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884) (finding that a fifty-eent levy on ship owners for every immigrant passenger entering a U.S. port was not a tax because the money was used to regulate immigration, not for the general support of the government). Following that precedent, the Courts of Appeals for the Eighth and Ninth Circuits have decided that assessing the costs of a new drainage culvert and the costs of railroad regulation, respectively, are not taxes within the meaning of section 11501. See Chicago & North Western, 71 F.3d at 265; Union Pac. R.R. Co. v. Public Util. Comm’n of Or., 899 F.2d 854 (9th Cir. 1990). Those Courts reasoned that since the government levies at issue did not raise money for the general welfare, they were not taxes within the meaning of the respective statutes.
Wheeling’s counter argument is that the assessment must be a tax because it partially relieves the state or township fisc of the cost *97 of a bridge benefitting the public. This argument is not convincing. The bridge assessment does not contribute to the general fund of either the Township or the Commonwealth and is specific to a particular bridge at a particular crossing. Moreover, none of the levies in Chicago & North Western, Union Pacific, Head Money Cases, and Decatur were held to be taxes, even though they all arguably relieved burdens on the public fisc.
According to Wheeling, Chicago & North Western held that assessments are not taxes because the improvement benefitted that railroad alone. We disagree, and believe that the more logical reading is that to the extent a portion of the project benefitted that railroad, the cost of that portion should be assessed to that railroad. Here, the Commission determined that a new bridge would benefit both the railroad and the public and assessed the costs of construction and maintenance accordingly. The Commission’s assessment order adopting the Recommended Decision of the Administrative Law Judge stated: “Only after the Commission determines a particular party has a direct interest in or bears some responsibility for or obtains a discernible benefit from a specific crossing, does the Commission exercise its authority under state law to assess construction and maintenance responsibilities.” (J.A at 249, emphasis added.) Here, Wheeling directly benefits from the above-grade crossing of the Township’s right-of-way because its trains are not impeded by any cross-traffic. This directly benefits Wheeling’s safety and efficiency. Although the bridge benefits the general public, the peculiar benefit Wheeling receives from the construction and maintenance of the bridge reinforces our conclusion that the assessment is not a “tax” within the meaning of section 11501.
There is no need to overrule either Amtrak or SEPTA, as the Commission urges. Bridge assessments were intended to be included in the phrase “taxes or other fees” regarding the statutes applicable to those two cases, construed broadly, but not intended to be included in the word “tax” in section 11501, construed strictly. We find that the weight of authority supports our conclusion that Congress did not manifest a clear intent to include the assessment of bridge construction and maintenance costs, like those at issue here, within the meaning of “taxes” in section 11501. Without taxes, there was no discriminatory taxation. Therefore, the Commission and the Township did not violate 49 U.S.C. § 11501.
IV.
In sum, we hold that the district court erred by concluding that the assessments were discriminatory taxes, and for the reasons set forth above, we will reverse.

. The original complaint alleges a violation of 49 U.S.C. § 11503. That section was recodified pursuant to Pub.L. No. 104-88, § 102(a) (1996). We will refer to provisions of the 4-R Act at issue here by section number as currently codified in title 49, U.S.Code.

. The Commission delegated this case to a Public Utility Commission Administrative Law Judge who issued a Recommended Decision. (J.A. at 226.) That decision included a proposed allocation of the construction and maintenance costs and also decided that Wheeling was not discriminated against on the basis of its railroad status. (J.A. at 245-50.) The Commission adopted the Recommended Decision in its September 23, 1994 Order. (J.A. at 266.)

. "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the Unites States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const, amend. XI. "[T]he Eleventh Amendment [stands] for the constitutional principle that state sovereign immunity limited the federal courts’ jurisdiction under Article III.” Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 63, 116 S.Ct. 1114, 1127, 134 L.Ed.2d 252 (1996). "[A] State can waive its Eleventh Amendment protection and allow a federal court to hear and decide a case commenced or prosecuted against it. The Amendment, in other words, enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary’s subject-matter jurisdiction.” Idaho v. Coeur d’Alene Tribe of Idaho, -U.S. -, -, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997).

. In its reply brief, the Commission analyzed whether it is an arm of the state under the criteria this Court set forth in Christy v. Pennsylvania Turnpike Commission, 54 F.3d 1140, 1144 (3d Cir. 1995). The Commission concluded that they are indeed an arm of the state, and Wheeling does not take issue with that determination.

. The Commonwealth of Pennsylvania has codified its position on immunity as follows: "Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States.” 42 Pa. Cons.Stat. § 8521.

. Subsection (c) states in pertinent part as follows:
"Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section.”
49U.S.C. § 11501(c).

. Since Seminole, the District of Wyoming is the only other court to address this issue, specifically regarding the 4-R Act. See Union Pac. R.R. Co. v. Burton, 949 F.Supp. 1546 (D.Wyo.1996). We disagree with that court’s analysis because it was restricted to the expressed purposes of the 4—R Act set forth in section 10101. See id. at 1554. We look beyond the general purposes of the 4-R Act as a whole, to what we perceive as the purpose underlying section 11501, the portion of the act implicated here.

. The reasoning in Wilson-Jones was also rejected in another Fair Labor Standards Act case. See Mills v. Maine, 118 F.3d 37, 45 (1st Cir. 1997).

. The individual Commissioners also claim that they are immune from suit in federal court pursuant to the Eleventh, Amendment. Wheeling contends that the Commissioners are within the second exception noted above: state officials can be sued for prospective injunctive and declaratory relief from constitutional violations. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Balgowan v. New Jersey, 115 F.3d 214, 217 (3d Cir.1997); Laskaris v. Thornburgh, 661 F.2d 23, 26 (3d Cir.l981); see also Idaho v. Coeur d'Alene Tribe of Idaho, — U.S.-,-•, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997); Seminole, 517 U.S. 44, 72-74, 116 S.Cf 1114, 1132, 134 L.Ed.2d 252 (1996). The parties dispute whether the declaratory or injunctive relief that Wheeling seeks is truly prospective. Because we have decided that the Commission is not immune, we need not reach this issue.

. "The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a state may not do any of them: ... Impose another tax that discriminates against a rail carrier....” 49 U.S.C. § 11501(b)(4).